# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DUANE LEE HAHN, | CASE NO. 3:13-cv-2493-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | Docs. 1, 10, 11, 16, 19, 20, 23 |
| Defendant. | |

## MEMORANDUM

## I.    Procedural Background

On July 20, 2010, Duane Lee Hahn ("Plaintiff") filed an application as a claimant for disability insurance benefits under Title II of the Social Security Act, alleging disability with an onset of May 1, 2010.  Pl. Brief at 1; (Tr. 28).[1]  On November 8, 2011, an administrative law judge ("ALJ") held a hearing at which

---

[1] Plaintiff states, that the alleged onset date ("AOD") is May 1, 2010.  Pl. Brief at 1.  However, "[f]or a reason unknown to the Plaintiff, the alleged onset date was changed by the Administration to December 31, 2005."  Pl. Brief at 1. The Court notes that in a "Disability Determination Transmittal" document dated doc dated October 10, 2010, the listed AOD date is December 31, 2005 (Tr. 84) and in a "DDS Disability Worksheet" dated August 12, 2010, the listed onset date is December 31, 2005, and listed "stop work date" of May 1, 2010 (Tr. 342).  It is noted that Plaintiff requested that the ALJ amend the AOD, however, the request appears to have been ignored.  It does not appear from the record, nor does Plaintiff contend that the failure to amend the AOD resulted in prejudicial error.

Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified.  (Tr. 52-83).  On December 6, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits.  (Tr. 25-39).  On January 24, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 22-24), which the Appeals Council denied on August 13, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-6).

On October 2, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  Doc. 1.  On January 14, 2014, the Commissioner ("Defendant") filed an answer and administrative transcript of proceedings.  Doc. 10, 11.  On March 13, 2014, Plaintiff filed a brief in support of the appeal ("Pl. Brief").  Doc. 16.  On April 17, 2014, Defendant filed a brief in response ("Def. Brief").  Doc. 19.  On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 1, 2014, Plaintiff submitted a reply.  Doc. 20.  Both parties consented to the referral of this case to the undersigned Magistrate Judge, and an order referring the case to the undersigned Magistrate Judge was entered on June 23, 2014.  Doc. 22, 23.

## II. Relevant Facts in the Record

Plaintiff was born October 17, 1964, and thus was classified by the regulations as a younger person through the date of the ALJ decision on December 6, 2011.  (Tr. 35); 20 C.F.R. § 404.1563(c).  He completed the twelfth grade with no additional formal education or training.  (Tr. 55-56).  Plaintiff originally sustained injuries in a 1996 motorcycle accident.  (Tr. 333).  He has had a history of back related pain, and reported a worsening of his pain in June 2010.  (Tr. 276). Plaintiff had four prior relevant employment positions: auto-detailer, wielder, sample collector, and delivery driver.  (Tr. 73).

### A. Relevant Treatment History and Medical Opinions

### 1.  East Berlin Family Practice: Mark Henry, M.D., and Edward Nelson, M.D.

Plaintiff received treatment at East Berlin Family Medicine, from September 2005 to August 2011.  (Tr. 289-317).  In August 2008, Plaintiff reported that two ibuprofen tablets "control things quite well."  (Tr. 293).  In February 2010, Plaintiff reported that he and his wife had to care for his grandchild because his daughter was entering a rehabilitation program.  (Tr. 306).  In March 2010, a provider reported that the cholesterol maintenance drug Simvastatin caused body aches for Plaintiff.  (Tr. 308).

In May 2010, Dr. Nelson reported that Plaintiff, who stated that physical therapy and physiatrist did not prove "all that helpful," lived with his chronic pain and did not want to take medication if possible. (Tr. 309). Examination showed no leg edema, limited back flexion motion, and normal abduction and extension. (Tr. 310). In a treatment record dated June 2, 2010, Plaintiff called to ask for a prescription for pain medication due to worsening back pain. (Tr. 312). In a treatment record dated July 1, 2010, Plaintiff reported that due to his chronic low back pain it was difficult to assess if there were any side effects of the cholesterol medication in terms of myalgias. (Tr. 313).[2]

In August 2011, Dr. Nelson stressed the importance of losing weight and formal physical therapy to treat his chronic back pain, but Plaintiff indicated that he could not arrange to do physical therapy at that time. (Tr. 397). In a treatment record dated August 5, 2011, Dr. Nelson observed that Plaintiff had full range of back motion, mild lumbar spine tenderness, and normal motor strength in both legs. (Tr. 398). Plaintiff sometimes took three to four ibuprofen pills daily,

---

[2] The Court notes that Defendant points out that from 2008 to 2010 the treatment records of East Berlin Family Practice state that Plaintiff was employed part-time. Other information in the background section of the treatment records provides dates as to when the information was gathered, whereas the occupation section does not include any date. It is unclear whether such notation of part-time work is an accurate reflection of Plaintiff's activities or merely erroneously copied information, thus not probative. *See e.g.*, (Tr. 239, 293, 295, 298, 301, 302, 305, 307, 310, 314).

wanted to restart the arthritis pain medication Nabumetone, and did not wish to return to his pain management specialist.  (Tr. 398).

## 2.  Samuel D'Agata, M.D., Orthopedic Surgeon

In June 2010, Plaintiff visited Dr. D'Agata, and reported a worsening of his pain.  (Tr. 277).  Plaintiff reported a history of three broken vertebrae during his childhood, a birth defect in his right hip, and a long recuperation following his motorcycle accident.  (Tr. 277).  Dr. D'Agata also noted that Plaintiff had not been working on a regular basis and cared for an uncle who recently passed away.  (Tr. 277).  Dr. D'Agata referred Plaintiff to Dr. Francis Kilkelly, who examined Plaintiff the following week.  (Tr. 276).

## 3.  Francis X. Kilkelly, M.D.

In a treatment record dated June 23, 2010, Dr. Kilkelly noted that Plaintiff was treated more than thirty years ago for what "sound[ed] like L5 spondylolysis" and noted that Plaintiff "was braced" during his childhood.  (Tr. 276).   Plaintiff reported that he has had back pain and bilateral buttock and leg pains.  (Tr. 276). Although Plaintiff reported that the pains were typically in the posterior thigh, in addition to some groin and testicular pain, Dr. Kilkelly stated that he was "not necessarily convinced" that the reported pain related to his back.   (Tr. 276).

During the June 2010 visit, Plaintiff reported that he had recently experienced increased pain and had been using anti-inflammatory medication.  (Tr. 276).

With regards to radiology images of Plaintiff's lumbar spine Dr. Kilkelly observed a pars defect and states that there "may . . . be a slight slip, but it [was] not pronounced."  (Tr. 276).  Upon exam Dr. Kilkelly observed that Plaintiff had normal motor strength, normal reflexes and "no trochanteric tenderness or hip irritability."  (Tr. 276).  Dr. Kilkelly concluded that given Plaintiff's "extensive nonsurgical treatment," it would be worth looking at all of his options, and after magnetic resonance imaging ("MRI") results, determine whether surgery would be an option.  (Tr. 276).

On July 7, 2010, Dr. Kilkelly reviewed Plaintiff's MRI study of his lumbar spine and noted disc degeneration at the L4-L5 and L5-S1 levels, with the greatest disc herniation at the L3-L4 level where there was disc space collapse and a suggestion of retrolisthesis, and pedicle edema above the pars defect.  (Tr. 276, 282).  Dr. Kilkelly advised against surgery because the MRI did not reflect central canal stenosis or foraminal stenosis.  (Tr. 276).  Dr. Kilkelly recommended strengthening and conditioning of Plaintiff's trunk musculature and injections, explaining that Plaintiff should consider surgery "only if and when'' his symptoms

interfere with his activity or quality of life, or if he developed severe leg pain or motor weakness.  (Tr. 276).

### 4.  Edwin Aquino, M.D.

Dr. Aquino, a physiatrist, treated Plaintiff from September 2007 to October 2010.  (Tr. 333-42).   In June 2010, Plaintiff asked Dr. Aquino for a disability determination.  (Tr. 361).   Upon examination, Dr. Aquino observed lumbosacral spine tenderness, back spasms, nearly full range of back motion with pain complaints, and normal muscle strength in both of Plaintiff's legs.  (Tr. 361-62). Plaintiff was taking six to eight ibuprofen tablets (200mg each) daily.  (Tr. 362). Dr. Aquino diagnosed lumbosacral radiculopathy and lumbago.  (Tr. 362).   One month later, on July 13, 2010, nerve conduction studies and an electromyogram (EMG) of Plaintiff's legs confirmed bilateral L4 radiculopathy, but showed no evidence of plexopathy or peripheral neuropathy.  (Tr. 367).

On July 29, 2010, Plaintiff reported back pain at a level of five to nine of a scale where ten indicated the most severe pain and Plaintiff reported that pain was aggravated with work activity.  (Tr. 372).   During the July 2010 examination and the examination on May 17, 2011, Dr. Aquino observed that Plaintiff had normal reflexes and muscle strength in his legs, mild lumbar spine tenderness and spasms,

nearly full range of back motion with pain, and radicular pain to buttocks upon forward flexion. (Tr. 372, 374).

With regard to Plaintiff's trunk rotation, on September 4, 2007, and on September 13, 2007, Dr. Aquino observed that Plaintiff had lateral rotation and bending at 25-30 degrees with complaints of pain. (Tr. 352, 359). On May 17, 2011, and On June 21, 2011, Dr. Aquino observed that Plaintiff had "lateral rotation and bending at 30-35 degrees with pain complaints" further stating that "[l]ateral rotation and bending were close to full with mild [end-range] pain complaints." (Tr. 374, 383).

On a functional capacity questionnaire form dated October 18, 2010, Dr. Aquino reported that Plaintiff had constant back pain with radiation into his buttocks, with numbness and paresthesias into the lower extremities. (Tr. 333). Dr. Aquino reported that work activity with lifting and bending exacerbated his pain. (Tr. 333). Plaintiff had no paravertebral spasms; normal reflexes; and no ankylosis, arachnoiditis, or pseudoclaudication. (Tr. 333-34). Range of motion testing revealed that Plaintiff had slightly reduced lumbar flexion/extension (70 degrees to 80 degrees out of a full range of 90 degrees), but normal range of motion in all other regions. (Tr. 340). Plaintiff did not use an assistive device for ambulation or weight-bearing, and none had been prescribed. (Tr. 334). Plaintiff

had a normal gait without antalgia. (Tr. 334). He exhibited difficulty with squatting. (Tr. 335). Plaintiff was not taking any medication related to his pain complaints. (Tr. 335).

In a treatment record dated May 17, 2011, Dr. Aquino noted that a functional capacity evaluation ("FCE") conducted in April 4, 2011 (Tr. 227-256) was a valid study, and showed that Plaintiff demonstrated an ability to function in the full light physical demand level, according to the U.S. Department of Labor and Standards for an eight-hour work day. (Tr. 375). Dr. Aquino noted that Plaintiff's occupation as an automobile detailer was classified as medium work. (Tr. 375). Repeat EMG/NCS tests in June 2011 also showed bilateral L4 radiculopathy. (Tr. 381).

Dr. Aquino noted on June 21, 2011, that Plaintiff's low back pain was fairly constant with radiation to both legs with numbness and paresthesia, and that lumbar injections provided no noticeable improvement. (Tr. 383). Examination findings revealed lateral rotation and bending were nearly full with mild pain complaints at the end ranges. (Tr. 383). Dr. Aquino advised Plaintiff to continue present medical management and treatment. (Tr. 384).

In a letter to Plaintiff's counsel dated October 30, 2011, Dr. Aquino stated that Plaintiff met the criteria of Listing 1.04 since July 2010 and based his

conclusion on Plaintiff's lumbar spine degenerative disc disease ("DDD") and bilateral radiculopathy in his legs, numbness and paresthesias in both hands, positive straight leg raising ("SLR"), and hip motor and muscle weakness. (Tr. 346-47). Dr. Aquino agreed with the light Residual Functional Capacity ("RFC") assessed in the April 2011 FCE, but opined that Plaintiff additionally should not perform forward bending, stooping or trunk rotation, "especially while lifting." (Tr. 347). Dr. Aquino stated that he imposed the restrictions because they would worsen Plaintiff's condition and possibly cause Plaintiff to re-injure himself and lose more function. (Tr. 347).

### 5. Michael Mesaros, M.D., State Agency Consultative Opinion

On October 8, 2010, Dr. Mesaros reviewed Plaintiff's file and opined that he could perform the physical demands of competitive work despite his DDD and other impairments. (Tr. 326-31). Specifically, Dr. Mesaros concluded that Plaintiff could perform light exertional work; frequently use ramps and climb stairs; occasionally climb ladders and scaffold; never climb ropes; frequently balance, stoop, kneel, crouch, and crawl; and needed to avoid even moderate exposure to hazards like working with machinery or at heights. (Tr. 326-28). Dr. Mesaros noted that neither treating nor examining source opinions were available at the time of his review and opinion. (Tr. 329).

Dr. Mesaros noted that Plaintiff's records did not reflect any numbness, tingling, progressive weakness, or bladder or bowel dysfunction.  (Tr. 330).  Dr. Mesaros also noted that the three physicians who examined Plaintiff in June and July of 2010 all concurred that Plaintiff had no neurological deficits.  (Tr. 330). Dr. Mesaros also cited Plaintiff's examination which showed normal motor strength and posture and no need for an assistive device, as well as the fact that the specialists did not recommend surgery, instead recommended physical therapy, oral medication, and injections.  (Tr. 330-31).  Dr. Mesaros also noted that Plaintiff did not use a TENS unit, noted Plaintiff's ability to perform his daily activities, shop, and drive, that Plaintiff stated that ibuprofen does not relieve his pain, but makes the pain tolerable, and that records stated that Plaintiff changed positions frequently in his chair during the interview.  (Tr. 331).  Dr. Mesaros concluded that Plaintiff was capable of light work.

### 6.  Orthopedic Institute of Pennsylvania: Ronald Dahl. D.O.

On July 13, 2010, Dr. Dahl examined Plaintiff for his back and bilateral leg pain complaints.  (Tr. 324, 348).  Plaintiff exhibited a normal posture and gait, his legs were neurovascularly intact with good sensation and good distal pulses, positive SLR bilaterally, no clonus or myelopathy, normal reflexes bilaterally, palpable tenderness across his lumbar spine, and painful lumbar flexion and

extension. (Tr. 324, 348). Dr. Dahl recommended steroid injections but Plaintiff stated he wanted "to think about it." (Tr. 324, 348). Plaintiff returned to Dr. Dahl, in March 2011, with complaints of pain radiating down his leg; ibuprofen failed to resolve his pain. (Tr. 349). Plaintiff had an antalgic gait, neurovascularly intact lower extremities, positive SLR on the right, normal reflexes, no clonus or myelopathy, and lumbar spine tenderness. (Tr. 349). Pursuant to Dr. Dahl's recommendation, two days later, Plaintiff received a lumbar epidural steroid injection. (Tr. 349-51). Plaintiff reported mild relief of low back and buttocks discomfort, but no improvement of radicular symptoms due to the injection, and was reluctant to undergo a second injection. (Tr. 394).

### 7.  Evidence Submitted After the December 2011 ALJ Decision

### a.  Dr. Dahl's Opinion, February 6, 2012

In a letter dated February 6, 2012, Dr. Dahl stated that he agreed with Dr. Aquino that Plaintiff has "continuously met the listing of 1.04 disorders spine based on a grade 1 spondylolisthesis at L5-S1 and also having multilevel degenerative disc disease and neural foraminal stenosis in the lumbar spine." (Tr. 9). Dr. Dahl further opined:

> I also reviewed the judge's decision in regards to [Plaintiff's] application tor disability. The judge found that [Plaintiff] did not meet the criteria for the listing of 1.04C which he reports requires spinal

stenosis resulting in pseudoclaudication. I would argue that this is incorrect, and based on review of [Plaintiff's] MRI he was found to have multilevel neural foraminal stenosis at L2-3, L3-4, L4-5 as well as L5-S1. The patient does have a neurogenic claudication manifesting itself in radicular symptoms that would be brought on by placing the patient on a treadmill and not too long after him being on the treadmill he would start to develop radicular symptoms, which by definition is pseudoclaudication. He also, based on the criteria for the listing of 1.04A, does have evidence of nerve root compression with positive straight leg raise. It also should be noted that in the judge's record that he reviewed my records on 07/13/2010. I noted in those records that [Plaintiff] had a positive straight leg raise bilaterally. The judge stated that I said [Plaintiff] was in no acute distress, very cooperative with normal posture and gait and also noted that I stated that he was neurovascularly intact in bilateral lower extremities. Based on review of my records, this would not at all confirm that [Plaintiff] did not meet the listing for the spinal stenosis. He has an MRI which shows significant nerve root entrapment at multiple levels. He had an EMG/nerve conduction study which showed bilateral L4 radiculopathy and he has a grade 1 spondylolisthesis which causes dynamic instability with flexion and extension.

I believe with the reasonable degree of medical certainty that [Plaintiff] does meet the criteria for 1.04A and 1.04C. I would strongly recommend appeal, and these opinions are based on a reasonable degree of medical certainty.

(Tr. 9).

### b.  Orthopedic and Spine Specialists, PC: Brian Koons, PA-C; Steven J. Triantafyllou

In a treatment record dated January 16, 2012, Mr. Koons observed that Plaintiff had normal posture and gait.  (Tr. 11).  Plaintiff was able to walk heel to

toe without difficulty.  (Tr. 11).  Mr. Koons further wrote that Plaintiff exhibited "minimal tenderness in the cervical spine in the midline and paraspinal areas . . . [and] tenderness in the midline, paraspinal, PSIS and sciatic notch areas bilaterally" of the low back.  (Tr. 11).  Mr. Koons observed that Plaintiff's lumbar range of motion was diminished by fifty percent in flexion, fifty percent in extension, and twenty-five percent in lateral bending.  (Tr. 11).  Mr. Koons noted that Plaintiff's strength was good in the lower extremities bilaterally, straight leg tests were negative, and sensation was intact in the lower extremities bilaterally. (Tr. 11).  Mr. Koons also noted that x-rays taken that same day revealed pars defects at L5 bilaterally.  (Tr. 11).

In a treatment record dated February 6, 2012, Plaintiff saw Dr. Triantafyllou to review a recent MRI scan of his lumbar spine and address his ongoing back and leg pain.  (Tr. 13).  Upon examination, Dr. Triantafyllou noted generalized tenderness of the lumbar spine and a limited range of motion.  (Tr. 13).  Dr. Triantafyllou wrote that Plaintiff's neurological examination was "intact with regards to motor, sensory, and reflex testing," and "provocative tests [were] negative."  (Tr. 13).  Dr. Triantafyllou opined that the MRI of Plaintiff's lumbar spine dated January 19, 2012, showed "dehydration changes at L3-4, L4-5, and to a lesser degree at L5-S1," pars defects at L5 without evidence of spondylolisthesis,

with a canal that was "relatively patent at the L5-S1 level."  (Tr. 13).   Dr.

Triantafyllou noted that there was significant stenosis at the L3-4 and L4-5 levels,

"in part due to facet hypertrophy, ligamantum flavum hypertrophy and diffuse disc

protrusions."  (Tr. 13).  Plaintiff indicated a desire to pursue surgical options.  (Tr.

13-14).

### III.     Review of ALJ Decision

When reviewing the Commissioner's decision denying a claim for disability

benefits, the Court must uphold the findings of the Commissioner so long as those

findings are supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211,

1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir.

2008).   Substantial evidence is a deferential standard of review.   *See Jones v.*

*Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean

a large or considerable amount of evidence, but rather 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"   *Pierce v.*

*Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v.*

*N.L.R.B.*, 305 U.S. 197, 229 (1938)).   Substantial evidence requires only 'more

than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.

1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be

less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might

accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not

disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## A. Step Five Vocational Expert ("VE") Testimony

Plaintiff argues that the vocational expert's testimony failed to satisfy the statutory burden of proof that jobs existed in significant numbers in the economy that Plaintiff could perform.  Pl. Brief at 5-7, Reply Brief at 2.  Specifically, Plaintiff asserts that the record does not contain substantial evidence because: 1) there was no testimony from the vocational expert that the identified jobs existed in significant numbers in the economy, testifying instead that the number of jobs available with that RFC was "very limited" and that "there's not a lot of jobs"; and, 2) the vocational expert's testimony regarding both identified jobs significantly conflicted with the Dictionary of Occupational Titles ("DOT") in that the vocational expert's testimony regarding the jobs was not accurate.  Pl. Brief at 5-6, Reply Brief at 2.

At step five, it is the Commissioner's burden to prove that there are jobs in the national economy that the Plaintiff can perform, given the impairments accepted by the ALJ.  *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000).  If work a claimant can do "exists in the national economy"—that is, if "there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications"—the claimant will not be considered disabled.  *See* 20

C.F.R. § 404.1566(b); *see also Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (holding that 200 jobs in regional economy "is a clear indication that there exists in the national economy other substantial gainful work which [claimant] can perform."); *accord Russo v. Comm'r of Soc. Sec.*, No. CIV.A. 13-06918 FLW, 2014 WL 6991987, at *11 (D.N.J. Dec. 10, 2014).

### 1. Significant Number of Jobs

Plaintiff argues that there was no testimony from the vocational expert that the identified jobs existed in significant numbers in the economy, testifying instead that the number of jobs available with the given RFC was "very limited" and that "there's not a lot of jobs."  In this instance, Plaintiff takes the VE's testimony out of context.  Before the excerpt quoted in Plaintiff's brief, the VE testified that since the ability of siting and standing at will is not directly addressed in the DOT, she had to reduce the provided numbers by fifty percent.  (Tr. 74).  The VE testified, that given the criterion of a light exertion level, for the additional "sit/stand" at will limitation, "I have to reduce my numbers by 50 percent, so it'd be national 400,000, state of Pennsylvania, 5,000, and local 400. I also have machine tender, laminating, which allows for sit/stand. It's DOT 569.686-046, and with the reduced numbers, that's 300,000 national, 18,000 state, and 200 local." (Tr. 74).  Next, the

ALJ asked the VE what jobs would exist assuming a sedentary exertional category.

(Tr. 74).  The Vocational Expert testified:

> . . . at sedentary I have a table worker quality control, DOT 739.687-182. With reduced numbers, it's 500,000 national, 10,000 state of Pennsylvania, and 300 local. Also there are -- there's the receptionists/information clerks such as the person downstairs who gave us our tags. It's a greeter positions, DOT 237.367-018, with reduced numbers 1,000,000 national, 20,000 state, and 300 local.

(Tr. 74-75).  Counsel for Plaintiff questioned the VE as follows:

> [Counsel:] . . . [Regarding the two sedentary jobs identified], are you considering the fact that the hypothetical claimant would need to alternate between sitting and standing at will?

> [VE:] . . . yes, and that's from observation in the community. As we do job analyses, we look at jobs in the DOT. We read the descriptions, and we go out and look at the jobs and see which jobs can be performed sitting or standing without changing the rate of production. But it's not something in the DOT.

> [Counsel:] . . . the DOT doesn't address the opportunity to sit and stand?

> [VE:] No.

> [Counsel:] Would you agree, though, that with the jobs you identified that allow an opportunity to sit and stand at will . . . [through] whatever tasks they're doing?

> [VE:] That's correct. That's why if someone is examining small machine parts, as long as they can look at them and put them - the bad one in a box, and the good ones in another box, they can sit or stand. It doesn't interfere with the rate of production, or watching a line, as long as you can see the line and stop it with a button, or pull off a bad

pretzel, yes. *There's not a lot of jobs. That's why their numbers are reduced. There's not a lot. . . .* And that's why it's very limited.

(Tr. 80-81) (emphasis added).

Plaintiff argues that:

> The ALJ never asked [the VE] to identify jobs that "exist in significant numbers in the economy," he only asked for "any other types of jobs." That testimony alone clearly requires remand as the Commissioner has no proof at all that the jobs identified exist in significant numbers and, in fact, the vocational testimony suggests the opposite; that the jobs are "very limited" and that "there's not a lot of jobs." At very least, the testimony should be viewed as equivocal testimony regarding whether the jobs identified actually exist in significant numbers.

Pl. Brief at 9.  This argument is without merit.  It is apparent from the hearing transcript that the VE testified that in order to accommodate the ability to sit and stand at will in the hypothetical, she had to reduce the given numbers by fifty percent.  (Tr. 74).  The "reduced numbers" language stated by the VE correlates to the VE's statements of "very limited" and "there's not a lot of jobs" cited by the attorney.

Moreover, the VE's characterization of the cited numbers of jobs as "very limited" does not replace the actual numbers of jobs stated in the testimony.  There is no need to speculate what the phrases "very limited" and "there's not a lot of jobs" mean because the VE explicitly stated the number of jobs available.  (Tr. 74-

75).  For the sedentary exertional category with the "sit/stand" requirement, the Vocational Expert testified that Plaintiff could work either as a: 1) "table worker quality control" (DICOT 739.687-182) with "reduced numbers" (as explained above, reduced by fifty percent) of 300 jobs locally; or 2) receptionist/information clerk (DICOT 237.367-018) with "reduced numbers" of 300 jobs locally.  (Tr. 74-75).  The Third Circuit in *Craigie v. Bowen*, has previously held that 200 jobs in regional economy "is a clear indication that there exists in the national economy other substantial gainful work which [a plaintiff] can perform."  *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987).

The Court finds that the VE's identification of table worker and information clerk positions, each with 300 jobs locally meets the requirement that the jobs available to Plaintiff "exist in significant numbers in the economy."

## 2.  Conflict with the DOT

Plaintiff further argues that "the vocational expert's testimony regarding the requirements of the identified jobs was inaccurate and in conflict with the DOT." Pl. Brief at 9, Reply Brief at 2-4.  Specifically, Plaintiff directs the Court to the VE testimony stating that Plaintiff was capable of working as a "receptionist/information clerk" and gave the example "such as the person

downstairs who gave us our tags ... [i]t's a greeter position, DOT 237.367-018." Plaintiff correctly points out that the cited "information clerk" DOT number 237.367-018 pertains to a light exertional job within the motor transit, railroad transit and water transit industries. Given the example and description that the VE provided, it appears that the VE was describing sedentary positions generally within the general category of 237.367, such as 237.367-050 for tourist-information assistant, 237.367-038 receptionist, and 237.367-022 information clerk, all of which are sedentary positions and encompass the general description provided by the VE. However, given the lack of specificity, there is no way to discern whether the VE's testimony regarding the numbers of jobs that exist for only the DOT number 237.367-018, or for jobs that correspond to the VE's description of the job duties. The ALJ erred in failing to clarify this conflict.

However, the Court does not find a similar error in the remaining job identified by the VE. Plaintiff further argues that the VE's testimony regarding the position identified, "Table Worker" is equally flawed. Pl. Brief at 11-12, Reply Brief at 2-4. Plaintiff explains that the "examples provided by [the VE] involve pretzels and machine parts, while the DOT specifically indicates that the employee '[e]xamines squares (tiles) of felt-based linoleum material passing along on a conveyor belt . . .' Pl. Brief at 11. However, Plaintiff conflates the VE's

testimony regarding the sedentary "Table Worker" position with the VE's testimony regarding a light exertional ability with the added "restriction from any stooping, forward bending, and/or . . . lifting from floor to waist." *Compare* (Tr. 74-75 (describing sedentary exertion "table worker" DOT 739.687-182)) *with* (Tr. 76-77 (describing light exertion "bakery worker conveyor line" DOT 524.687-022)). Ultimately, in the decision dated December 6, 2011, the ALJ specifically found that the VE's testimony regarding "Quality Control Worker (DOT# 739.687-182; sedentary; 500,000 jobs available nationally; 10,000 statewide; 300 locally)" demonstrated what job was available to an individual with Plaintiff's RFC. (Tr. 36).

As observed by the court in *Sanborn v. Colvin*, "[e]ven if there is a conflict between the VE's testimony and the DOT, an unexplained inconsistency is not per se fatal to the ALJ's determination so long as there is substantial evidence in the record to support the ALJ's finding." *Sanborn v. Colvin*, No. 13-224, 2014 WL 3900878, at *18 (E.D. Pa. Aug. 11, 2014) (citing *Williams v. Barnhart*, 424 F.Supp.2d 796, 800–01 (E.D. Pa. 2006). In this instance, the VE detailed responses to the hypothetical questions which encompassed Plaintiff's RFC and explained the basis for her knowledge of work environments for limitations unlisted in the DOT. (Tr. 72-81). The ALJ found such testimony to be consistent

with the DOT.  (Tr. 36).  The VE's testimony constitutes substantial evidence in the record to support the ALJ's analysis.  *See Sanborn v. Colvin*, No. 13–224, 2014 WL 3900878, at *18 (E.D. Pa. Aug. 11, 2014); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (holding that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record); *see also Plummer*, 186 F.3d at 431; *Sanborn v. Colvin*, No. 13–224, 2014 WL 3900878, at *18 (E.D. Pa. Aug.11, 2014).

Moreover, Plaintiff's argument that the ALJ insufficiently accounted for Plaintiff's need to alternate sitting and standing is unpersuasive.  As recognized in Social Security Ruling 96-9p, "the occupational base for a full range of unskilled sedentary work will be eroded" in cases where an "individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically."  SSR 96-9p.  Such situations, however, do not mandate a finding of "disabled."   Rather, the Administration recommends that the ALJ "consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work."  SSR 96-9p; *see also* SSR 83-12 ("In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to

clarify the implications for the occupational base."); *accord Fickes v. Colvin*, No. CIV.A. 3:13-288, 2014 WL 4384608, at *3-4 (W.D. Pa. Sept. 4, 2014).

Contrary to Plaintiff's suggestion, the record contains vocational expert testimony on this very question. The ALJ specifically inquired about the ability to sit and stand at will and the VE provided testimony regarding her expertise and observing work conditions, in addition to knowledge of the DOT. (Tr. 72-74, 80). With regards to the need to alternate between sitting and standing at will, the VE stated that her testimony was based on her experience from "observation in the community," specifying that as a part of her job "we do job analyses, we look at jobs in the DOT. We read the descriptions, and we go out and look at jobs and see which jobs can be performed sitting or standing without changing the rate of production." (Tr. 80). Based on the foregoing, the Court finds no conflict between the DOT and the Table Worker position that would require a remand.

**B. RFC**

Plaintiff argues that the ALJ erred in not including a restriction from any forward bending, stooping, or trunk rotation in Plaintiff's RFC as per Dr. Aquino's opinion. (Tr. 6, 13). In the October 2011 opinion, Dr. Aquino restricted Plaintiff from any forward bending, stooping, or trunk rotation at any time during an eight hour work day "because doing those restricted activities would worsen his

condition to the point that he may be reinjured, and lose more function." (Tr. 347).
The ALJ found that Plaintiff was capable of frequent balancing, stooping,
kneeling, crouching, and crawling.  (Tr. 31).

Even if it were error for the ALJ not include forward bending or stooping
impairments as a part of the RFC, such error would be harmless.  *See Rutherford v.
Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).   Specifically, one of the jobs
identified by the vocational examiner, Table Worker (DICOT 739.687-182) does
not require any forward bending motion:

> Stooping: Not Present - Activity or condition does not exist
> Kneeling: Not Present - Activity or condition does not exist
> Crouching: Not Present - Activity or condition does not exist
> Crawling: Not Present - Activity or condition does not exist

DICOT 739.687-182.  As the Court in *Rochek v. Colvin* observed:

> [A] number of other courts have found harmless error where an
> alleged limitation that was not included in the ALJ's hypothetical (or
> in the RFC) was not necessary to perform one or more of the jobs
> identified by the VE, according to the DOT. *E.g. Caldwell v.
> Barnhart*, 261 F. App'x 188, 190 (11th Cir.2008) (environmental
> exposure); *Powell v. Astrue*, CIV. SKG 10–02677, 2013 WL
> 3776948, at *9 (D. Md. July 17, 2013) (collecting Fourth Circuit
> district court cases).

*Rochek v. Colvin*, 2:12-CV-01307, 2013 WL 4648340 at *12 (W.D. Pa. Aug. 23,
2013); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005).  This

is an example where the VE identified a job that encompasses Plaintiff's alleged forward bending back impairments.

With regards to the ALJ not including a trunk rotation limitation, the ALJ noted that Dr. Aquino's records indicated that the range of motion for Plaintiff's trunk rotation and bending were "close to full."  (Tr. 34).  On May 17, 2011, and on June 21, 2011, Dr. Aquino observed that Plaintiff had "lateral rotation and bending at 30-35 degrees with pain complaints" further stating that "[l]ateral rotation and bending were close to full with mild [end-range] pain complaints." (Tr. 374, 383).  There is no evidence in the record that Plaintiff ever reported that trunk rotation exacerbated his symptoms or had ever caused injury to Plaintiff. Substantial evidence supports the ALJ's omission of a trunk rotation limitation in the RFC.

In sum, even if the ALJ had included the additional back bending limitations, Plaintiff would still have been able to perform the position of a Table Worker, which does not require any forward bending of the back.  *See* DICOT 739.687-182. When accounting for a forward bending limitation, there would still have been a job in the national economy that Plaintiff could perform.  Lastly, as discussed above, substantial evidence supports the ALJ's omission of a trunk rotation limitation from the RFC.

### C. Allocation of Weight to Medical Opinions and Listing 1.04

Plaintiff argues that the ALJ failed to properly consider the opinions of treating physicians, especially the opinion of Dr. Aquino dated October 30, 2011, wherein he stated that Plaintiff met the criteria of Listing 1.04 since July 2010.  Pl. Brief at 6, (Tr. 346-47 (Dr. Aquino's opinion).  Plaintiff further asserts that the opinions of Plaintiff's treating physicians "were not inconsistent and did not conflict with the other medical evidence of record, were supported by Plaintiff's MRI and EMG findings and there were no contrary opinions of record, in particular no consultative examination or independent medical records review."  Pl. Brief at 6.

Additionally, Plaintiff argues that the ALJ "impermissibly substituted his lay opinions" in rejecting the opinions of Plaintiff's treating physicians.  Pl. Brief at 6. Plaintiff also argues that the ALJ's reliance on the state agency medical consultant is deficient given that the consultant's opinion was provided in October 2010, prior to the addition of other treatment records.  Pl. Brief at 20.  Plaintiff also points out that the ALJ gave significant weight to the "opinions" of Dr. Dahl, who prior to the hearing had not provided a formal opinion, however, "the ALJ found [Dr. Dahl] conducted 'thorough physical examinations.'"  Pl. Brief at 20.

The weight afforded to any medical opinion is dependent on a variety of

factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole.  20 C.F.R. § 404.1527(c)(3)-(4).  The opinions of specialists are generally given greater weight than non-specialists.  The consistency of medical opinions with the record is also significant. 20 C.F.R. §404.1527(c)(4)&(5).

An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.  *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008).  An administrative law judge must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory medical evidence, not on the administrative law judge's own credibility judgments, speculation or lay opinion.  *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (The ALJ may not substitute his own judgment for that of a physician).  The regulations require that the Commissioner "give good reasons in [the] notice of determination or decision" for the weight assigned to the treating source's opinion.  20 C.F.R. § 404.1527(d)(2); S.S.R. 96–2p, 1996 WL 374188, at *5.  The failure to provide "good reasons" for not crediting a treating source's opinion is a ground for remand.

*See* 20 C.F.R. 404.1527(d)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir.2001) (noting that failure to comply with 20 C.F.R. 404.1527(d)(2) warrants a remand).

However, a treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion.  *Id.* The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled.  *Id.*  Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded.  *Id.*

Medical opinions consisting largely of checked boxes absent of narrative citing to reasons and evidence to support findings are afforded less weight than opinions which include detailed narratives citing to objective medical evidence. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (explaining more weight is given to opinions that include objective medical evidence); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("[F]orm reports in which a physician's obligation is

only to check a box or fill in a blank are weak evidence at best."); *Knox v. Comm'r of Soc. Sec.*, 365 Fed.Appx. 363, 367-67 (2010) (finding that ALJ properly discounted treating physician's check-list opinion because its conclusions were not supported by objective narrative of any specificity.).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler*, 667 F.3d at 361; *Coleman v. Astrue*, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

A claimant must establish each element of a Listing to meet a Listing. 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies *all of the criteria in the listing*.") (emphasis added). As the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a claimant to qualify for benefits by showing that his unlisted

> impairment, or combination of impairments, is 'equivalent' to a listed
> impairment, he must present medical findings equal in severity to *all*
> the criteria for the one most similar listed impairment." *Id.* (emphasis
> in original).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one

element that is not satisfied, the ALJ will have substantial evidence to conclude

that a claimant does not meet a Listing.  *See Williams v. Sullivan*, 970 F.2d 1178,

1186.

### 1.  Weight to Opinion of Dr. Aquino, Treating Physician

The ALJ accorded Dr. Aquino's opinions "moderate weight," with exception

to Dr. Aquino's letter dated October 30, 2011, which the ALJ accorded "little

weight."  (Tr. 34).   The ALJ explained that Dr. Aquino's October 2011 letter

opining that Plaintiff met the criteria of listing 1.04, was "an issue to be decided by

the Commissioner of Social Security."  Tr. 34.  The ALJ further explained that:

> Dr. Aquino wrote, "the conditions with which [Plaintiff] has been
> diagnosed are expected to cause him significant pain. The conditions
> mentioned above impinge and injure the nerves and may elicit pain."
> However, these assertions are at odds with the vast majority of Dr.
> Aquino's treatment records.

(Tr. 34).   On the issue of Plaintiff meeting Listing 1.04,[3] the ALJ noted that

"throughout the medical evidence of record, and especially in the treatment notes

---

[3] Listing 1.04(A) & (C) states:

of Dr. Aquino, [Plaintiff] does not [have] persistent difficulty ambulating effectively." (Tr. 31). In addition to no ambulatory dysfunction, the ALJ pointed out that a "bone scan was within normal limits" and that:

> a nerve conduction study/EMG . . . performed July 13, 2010, was within normal limits with the exception of bilateral L4 radiculopathy. There was no evidence of cervical radiculopathy, brachial plexopathy, or peripheral neuropathy including entrapment. On July 29, 2010, [Plaintiff] has a nearly full range of lumbar motion. On October 18, 2010, Dr. Aquino noted that [Plaintiff] complained of pain radiating into his buttocks and lower extremities, but had no paravertebral muscle spasm. [Plaintiff's] reflexes were within normal limits. Regarding [Plaintiff's] range of motion, his flexion and extension was 70-80 degrees (with 90 degrees being normal). His right and left lateral flexion was within normal limits. Dr. Aquino found no evidence of ankylosis, arachnoiditis or pseudoclaudication. He noted that [Plaintiff] did not require an assistive device for ambulation or weight-bearing. [Plaintiff] had a normal gait, without antalgia. He was able to get on and off the examining table, and perform heel and-toe

---

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

walking, without noted difficulty. Dr. Aquino did note, however, that [Plaintiff] had difficulty squatting and rising from a squatting position.

(Tr. 32-33) (internal citations to record omitted).  The ALJ further wrote:

On May 17, 2011, Dr. Aquino noted that [Plaintiff] complained of pain radiating into his upper extremities and both hands, described specifically as "tightness and spasms." However, test of [Plaintiff's] shoulder range of motion was "close to full and fairly asymptomatic." [Plaintiff's] lumbar range of motion was slightly limited, although his rotation and bending were "close to full." [Plaintiff's] lower extremities were within normal limits.

(Tr. 34) (internal citations to record omitted).   The ALJ enumerated how Dr. Aquino's opinion that Plaintiff met the criteria of Listing 1.04 was inconsistent with his treatment records, namely the records demonstrating Plaintiff's ability to ambulate and no evidence of motor loss.  During the June 2010 examination, Dr. Kilkelly observed that Plaintiff had normal motor strength, normal reflexes and "no trochanteric tenderness or hip irritability."  (Tr. 276).  In an August 2011 examination, Dr. Nelson observed that Plaintiff had full range of back motion, mild lumbar spine tenderness, and normal motor strength in both legs.  (Tr. 398).

Courts analyzing Listing 1.04 have concluded that a claimant must point to evidence which establishes all of its criteria to demonstrate legal error warranting a remand.  In *Johnson v. Comm'r of Soc. Sec.*, the Third Circuit noted that although the record showed that the claimant exhibited some of the medical criteria set forth

in Listing 1.04A, there was no evidence of motor loss. *Johnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 202–203 (3d Cir. 2008). Likewise, in *Garrett v. Comm'r of Soc. Sec.*, the Third Circuit held that the ALJ's finding that the claimant did not meet Listing 1.04A was supported by substantial evidence because the claimant failed to point to evidence of nerve root compression. *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir. 2008); *see also Morrison v. Astrue*, 355 F. App'x 599, 601 (3d Cir. 2009) (finding that back impairment did not satisfy listing 1.04C where, although claimant was diagnosed with lumbar spinal stenosis, a claimant had normal strength in her lower extremities and normal range of motion); *accord Boggs v. Colvin*, CIV.A. 13-1229, 2014 WL 1670892 (W.D. Pa. Apr. 28, 2014). Accordingly, substantial evidence supports the ALJ's decision to give little weight to medical opinions concluding that Plaintiff met Listing 1.04 and the ALJ's finding that the Listing 1.04 was not met. *See Johnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 202–203 (3d Cir. 2008).

### 2. Weight to Opinions of Drs. Mesaros and Dahl

Plaintiff argues that the ALJ erred in according great weight to Dr. Mesaros' October 2010 opinion given that evidence was submitted after the opinion. Pl. Brief at 6, 20. Plaintiff also argues that the ALJ erred in according weight to the treatment records of Dr. Dahl, given that such treatment records are not a formal

opinion.  Pl. Brief at 6, 20.  The ALJ gave "significant weight to medical opinions of the State agency medical consultant [Dr. Mesaros], who reviewed the full medical evidence of record in this matter. Significant weight is also given to Dr. Dahl and Dr. Kilkelly, who conducted thorough physical examination of the claimant. . . ."  (Tr. 34).  For Dr. Dahl, the ALJ noted:

> On July 13, 2010, Raymond E. Dahl, D.O. noted that x-rays revealed Grade 1 spondylolisthesis at 15-Sl. A physical examination revealed positive straight leg raises bilaterally, although the claimant was in "no acute distress, very cooperative, with normal posture and gait" Dr. Dahl also noted that the claimant's bilateral lower extremities were neurovascularly intact with good sensation and good distal pulses. The claimant endorsed pain with flexion and extension of the lumbar spine. . . [O]n March 23, 2011[,] Dr. Dahl noted [Plaintiff] had an antalgic gait and a positive straight leg raise on the right side. . . .

(Tr. 33-34) (internal citation to record omitted).  The ALJ continued to address the October 2010 (Tr. 225-331) opinion of Dr. Mesaros, stating:

> State agency medical consultant noted that the claimant is capable of lifting and carrying 20 pounds on an occasional basis and 10 pounds on a frequent basis. He is able to stand/walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. [Plaintiff] is capable of unlimited pushing and pulling with his extremities. The consultant found that [Plaintiff] is capable of frequent balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. The consultant found [Plaintiff] capable of occasionally climbing ladders and scaffolds, but never climbing ropes. Further, the consultant found that the claimant has no postural, manipulative, visual, or communicative limitations, but should "avoid even moderate exposure" to hazards such as moving machinery or heights.

(Tr. 34) (internal citation to record omitted).

In the December 2011 opinion, the ALJ found that Plaintiff did not meet the criteria enumerated in 1.04.  (Tr. 31).  With regards to subpart C, the ALJ noted that "throughout the medical evidence of record, and especially in the treatment notes of Dr. Aquino, [Plaintiff] does not [have] persistent difficulty ambulating effectively."  (Tr. 31).  With regards to subpart A, the ALJ found that the evidence did not demonstrate "motor loss accompanied by sensory or reflex loss," later citing the evidence reflecting Plaintiff's motor, sensory, and reflex abilities.  (Tr. 31, 33-34).   Since the ALJ addressed the evidence of medical treatment and opinions that occurred after Dr. Mesaros' opinion and the subsequent evidence did not undermine the conclusions in Dr. Mesaros' opinion, the Court finds no error in the weight the ALJ allotted to Dr. Mesaros' opinion.

While it is true that Dr. Dahl did not submit a formal comprehensive opinion regarding Plaintiff's limitations and abilities, Dr. Dahl did render opinions regarding Plaintiff's Listing 1.04 criteria, such as criteria regarding Plaintiff's range of motion, ability to ambulate, and straight leg raise results.  (Tr. 33-34). Plaintiff argues that Dr. Dahl's February 2012 opinion demonstrates that the ALJ erred in according significance to Dr. Dahl's treatment records rendered prior to

the decision, however, Dr. Dahl's February 2012 opinion still fails to establish *all* of the criteria required from Listing 1.04. *Compare supra* note 2 (Listing 1.04) *with* (Tr. 9) (Dr. Dahl's February 2012 opinion).

While it is true that Dr. Mesaros' October 2010 opinion occurred before Dr. Aquino's 2011 treatment records, the omission of subsequent evidence (Dr. Aquino's October 2011 opinion stating that Plaintiff met the criteria of Listing 1.04, and Dr. Dahl's February 2012 opinion) from Dr. Mesaros' October 2010 review does not demand a different conclusion than that reached by the ALJ. As the Third Circuit has observed:

> because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where "additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical ... consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing," is an update to the report required. SSR 96–6p (July 2, 1996) (emphasis added).

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). In this instance, it was reasonable for the ALJ to determine that the additional evidence would not have changed the State agency medical consultant's findings. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361. While Dr. Mesaros' opinion preceded those opining that Plaintiff met Listing 1.04, substantial evidence

supports the ALJ's according little weight to Dr. Aquino's October 2011 opinion, given that the October 2011 opinion still omitted key elements required to meet the requirements of Listing 1.04. The ALJ carefully detailed and addressed the evidence that came after Dr. Mesaros' opinion. Moreover, in a treatment record dated May 17, 2011, Dr. Aquino opined that Plaintiff demonstrated an ability to function in the full light physical demand level, according to the U.S. Department of Labor and Standards for an eight-hour work day. (Tr. 375). The ALJ did not err in according little weight to the October 2011 opinion of Dr. Aquino and supported his findings with careful explanations regarding inconsistencies in the record, as well as other evidence in the record.

Although Dr. Dahl did not submit a formal opinion prior to the ALJ's decision, the ALJ's characterization of Dr. Dahl's treatment records as "opinions"[4] does not effect the outcome of the case. Substantial evidence supports the ALJ's allocation of weight to the medical source opinions.

---

[4] *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (defining "medical opinions" as "statements from physicians . . . that reflects judgments about the nature and severity of [plaintiff]'s impairments, including [plaintiff]'s symptoms, diagnosis, and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff]'s physical or mental restrictions.")

## A. Sentence Six

Plaintiff argues that the February 6, 2012, Report of Dr. Dahl and the Orthopedic and Spine Specialists' office treatment records from 2012 are new and material evidence and good cause exists for not presenting the evidence to the ALJ prior to issuance of the Notice of Determination.  (Tr. 6).

When the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). *See Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material," but only if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record.  *Id.*  In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."  *Id.*  The relevant time period is "the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. § 404.970(b); *Mathews*, 239 F.3d at 592.  The materiality standard also "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination."  *Szubak*, 745 F.2d at 833.

In a letter dated February 6, 2012, Dr. Dahl stated that he agreed with Dr. Aquino that Plaintiff has "continuously met the listing of 1.04 disorders spine based on a grade 1 spondylolisthesis at L5-S1 and also having multilevel degenerative disc disease and neural foraminal stenosis in the lumbar spine." (Tr. 9).  Dr. Dahl's February 2012 opinion fails to contradict the above-cited evidence regarding Plaintiff's ability to ambulate and motor loss. (Tr. 9).  Given that Dr. Dahl's February 2012 opinion does not negate other findings regarding Plaintiff's ability to ambulate and there is no indication of persistent motor loss, the opinion would not change the outcome of the ALJ's decision.  Additionally, the 2012 treatment records from Orthopedic and Spine Specialists do not establish that the findings relate to the relevant time period leading up to the ALJ's decision, instead, the records report observations contemporaneous to the time period after the ALJ decision.  In a treatment record dated January 16, 2012, a physician assistant observed that Plaintiff had normal posture and gait, was able to walk heel to toe without difficulty.  (Tr. 11).  In February 2012, Dr. Triantafyllou wrote that Plaintiff's neurological examination was "intact with regards to motor, sensory, and reflex testing," and "provocative tests are negative."  (Tr. 13).  The new evidence does not contradict the ALJ's previous findings that Plaintiff was able to ambulate and did not have motor loss and thus would not have changed the

outcome of the ALJ's determination.  *See Szubak*, 745 F.2d at 833.  Based on the foregoing, Plaintiff's Sentence Six argument fails and remand is not warranted.

## IV.     Conclusion

Based on the foregoing, the Court finds that the ALJ's decision lacks substantial evidence.   Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.


Dated: May 5, 2015                                    *s/Gerald B. Cohn*
                                                     GERALD B. COHN
                                                     UNITED STATES MAGISTRATE JUDGE